**In re Joseph H. HARMAN, Debtor.**

**Neil C. Gordon, Plaintiff,**

**v.**

**Joseph H. Harman, Shadrix Lane, P.C., et al., Defendants.**

Bankruptcy No. 11–67522–MHM.
Adversary No. 13–5211.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Filed April 1, 2014.

Neil C. Gordon, Theresa Y. Kananen, Sean C. Kulka Arnall, Golden, Gregory LLP, Atlanta, GA, for Plaintiff.

James L. Paul, Chamberlain, Hrdlicka, White et al., Gregory S. Brow, David E. Gordon, Gary W. Marsh, McKenna Long & Aldridge LLP, Carl H. Anderson, Jr., Hawkins Parnell Thackston & Young, LLP, John L. Bunyan, Johannes S. Kingma, Tyler J. Wetzel, Carlock, Copeland & Stair, LLP, Atlanta, GA, J. Nevin Smith,

Smith Conerly LLP, Carrollton, GA, for Defendants.

## ORDER ON SHADRIX LANE, P.C.'S MOTION TO DISMISS

MARGARET H. MURPHY,
Bankruptcy Judge.

This proceeding is before the court on Defendant Shadrix Lane, P.C.'s *Motion to Dismiss,* filed September 12, 2013 (Doc. No. 29) (the "Motion"). Debtor filed his Chapter 7 petition June 14, 2011. The Chapter 7 Trustee initiated this proceeding by filing a Complaint June 13, 2013, against Debtor and related persons and entities seeking avoidance and recovery of alleged fraudulent transfers and post-petition transfers made to the various Defendants and seeking declaratory judgment that certain Defendants are alter egos of Debtor or are otherwise invalid entities (Doc. No. 1, amended August 15, 2013 by Doc. No. 19) (as amended, the "Complaint"). Shadrix Lane, P.C. ("Shadrix") now asserts that the Complaint fails to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6).

## ALLEGATIONS OF FACT [1]

The Complaint alleges that Defendants are each part of a scheme by which Debtor has hidden assets from creditors while maintaining control over and reaping the benefits of those assets. Because Plaintiff's allegations against Shadrix are a small part of a larger alleged pattern of misconduct, a description of the allegations as a whole provides context.

The basis of the alleged scheme is Trustee's assertion that Debtor's wife, Linda Harman ("Mrs. Harman"), is a "straw man," and that assets held in Mrs. Harman's name are in fact owned by Debtor.

In support, Trustee alleges that Mrs. Harman has not been employed outside the home since 1974, and her only contribution to Debtor's business dealings are "ministerial acts" such as transferring funds between accounts and writing checks at the direction of Debtor. (Complaint at ¶ 34). Despite this, Debtor "divert[s] all remuneration to his wife" or into entities and instrumentalities nominally titled in her name. (Complaint at ¶ 35).

Similarly, Trustee asserts that Debtor uses the Linda J. Harman Irrevocable Trust (the "Trust") as a mechanism to place his earnings and property beyond the reach of creditors. Though the Trust instrument states that Mrs. Harman established the Trust with a $10 contribution, Trustee asserts that substantially all of the assets held in the Trust had been generated through Debtor's efforts. (Complaint at ¶¶ 100–01). More specifically, Trustee asserts the Trust was initially funded from proceeds of the sale of two companies Mr. Harman founded and managed. (Complaint at n. 8). Trustee also asserts that Debtor exercises exclusive control of the Trust. Though the preamble of the Trust names both Debtor and Mrs. Harman as Trustees, the body of the Trust provides that Mrs. Harman "shall never be permitted to serve as a Trustee or Co–Trustee hereunder...." (Complaint at ¶ 103). The Trust instrument designates Mrs. Harman and Debtor as co-beneficiaries, and states that Trust assets are to be used to support Mrs. Harman and Debtor. (Complaint at ¶ 102). Thus, Trustee asserts that the Trust is a self-settled trust, because Debtor is the settlor, trustee, and beneficiary of the Trust, and that Debtor has complete and exclusive control of all Trust assets. Trustee notes that this is corroborated by investment information of FCGI Associ-

---

1. At the Motion to Dismiss stage, allegations of fact are assumed to be true, and the pleadings are construed in the light most favorable to the nonmoving party.

ates, LLC ("FCGI"), which "assured potential investors that Debtor controls FCGI even though it is 99% owned by the Trust[.]" (Complaint at n. 9).

Trustee's allegations relating to the other Defendants primarily involve diverting Debtor's assets to the Trust or Mrs. Harman. For example, $200,005.46 was transferred February 28, 2008, from FCGI, an entity Trustee asserts is controlled exclusively by Debtor by virtue of Debtor's control of the Trust, to a bank account held in Mrs. Harman's name, without consideration. (Complaint at ¶ 42). Trustee asserts those funds were then used to pay for Debtor's residence, titled in Mrs. Harman's name, and household expenses. (Complaint at ¶ 43). Trustee also notes that at Debtor's § 341 meeting of creditors held July 19, 2011, Debtor acknowledged that he has transferred money to Mrs. Harman to avoid garnishment, stating, "At the time, I was experiencing garnishment so here popped in $3,300 into an account that was still open and I transferred it to my wife so that it would not be garnished." (Complaint at ¶ 61).

Trustee alleges that Debtor has used the Trust as a "hiding place for his assets, and as a means of hindering, delaying, and defrauding his creditors." For example, Debtor receives monthly Social Security benefits, which he has consistently deposited into bank accounts titled in the name of the Trust (the "Social Security Transfers"). (Complaint at ¶¶ 21–22). Trustee lists a number of transfers of funds which, Trustee alleges, belonged to Debtor, should have been paid to Debtor, or over which Debtor had possession and control, but were instead transferred into accounts titled in the name of the Trust ("Miscellaneous Trust Transfers"). (Complaint at ¶ 145). Trustee notes that FCGI has made substantial distributions but, despite Debtor's 1% ownership, all of those distri-

butions have been transferred into Trust accounts (the "FCGI Distribution Transfers"). (Complaint at ¶¶ 125–26).

Debtor also provides labor and services through FCGI, but is not paid directly for those services. For example, Debtor, through FCGI, provides consulting services to Stonemark Management LLC ("Stonemark"); Stonemark pays FCGI $3,000 per month, but FCGI does not pay Debtor for that or any labor he renders on FCGI's behalf. (Complaint at ¶¶ 140–41). Instead, Trustee alleges, FCGI diverts that income into the Trust (the "Stonemark Transfers"). Id.

Trustee asserts that several entities controlled by Debtor are mere alter egos through which Debtor funnels money. For example, First Equities Realty, LLC ("FER") was originally owned by the Trust and Debtor. (Complaint at ¶ 127). Debtor unilaterally amended FER's operating agreement in 2004 to state that he is the managing member, entitled to 100% of certain revenues and cash flow. (Complaint at ¶ 128). On January 1, 2008, in what Trustee characterizes as an attempt to divert assets, Debtor, as managing member of FER, assigned all lease payments due under a lease with Nextel South Corp.—$1,983.75 per month—to the Trust for no consideration (the "Nextel Lease Income"). (Complaint at ¶¶ 129–31). Curiously, Debtor's Schedule I indicates that Mrs. Harman, not the Trust, receives income of approximately $1,950 per month from a "Cell Tower Lease". (Complaint at ¶ 134).

First Equity Partners, Inc. ("FEP"), was formed April 14, 1989. (Complaint at ¶ 64). J.H.H. Holdings Corporation ("JHH") and First Equity Partners II, Inc. ("FEP II") were formed December 28, 1989. Id. Trustee asserts FEP and FEP II became fully-owned subsidiaries of JHH and, by virtue of his sole ownership

of JHH, Debtor controlled all three entities. *Id.* A document dated January 15, 1990, and executed by Debtor as president of JHH, FEP, and FEP II, purports to transfer to Mrs. Harman "all the Assignors' [JHH's, FEP's, and FEP II's] rights and interest in their direct and indirect investment properties' refinancing and sale proceeds"; the document provided that JHH, FEP, and FEP II would retain operational proceeds. (Complaint at ¶¶ 65–66). Trustee asserts this transfer was made for no consideration, and was honored "only sporadically, and when convenient for his own needs and to enable him to hinder, delay, or defraud creditors." (Complaint at ¶ 70). For example, though FEP II received sales proceeds in varying amounts from 2004 to 2008, only the sales proceeds from 2004 were actually transferred to Mrs. Harman. (Complaint at ¶¶ 80–81). Trustee also asserts the document was executed well after January 15, 1990, but backdated; in support, Trustee asserts that the font used in the document—Times New Roman—was not available to the public until 1992. (Complaint at ¶¶ 67–68).

On December 20, 1990, FEP, FEP II, and JHH became limited partners of First Concord, L.P. ("First Concord"). (Complaint at ¶ 112).

Trustee asserts that Debtor purported to transfer all of his stock in JHH to Mrs. Harman May 31, 2001 (the "Stock Transfer"). (Complaint at ¶ 73). However, Debtor filed a Chapter 7 petition initiating Case No. 99–13224 December 3, 1999, and that case was not closed until June 12, 2001. Trustee argues that because Debtor did not receive court approval of the Stock Transfer, the Stock Transfer was void. (Complaint at ¶ 74). Notably, JHH's federal tax returns from 2002 through 2010 show Debtor as the 100% owner. (Complaint at ¶ 77). Trustee asserts that Debtor continued to receive, at all relevant times, operational proceeds from JHH, FEP, and FEP II. (Complaint at ¶ 82). And, according to Trustee, Debtor's accountants were not made aware of the Stock Transfer until 2012, after Debtor filed the case (11–67522) under which this proceeding arises. (Complaint at ¶¶ 84–85). The Complaint alleges that Debtor, at times, claims ownership of JHH, FEP, and FEP II, and at other times disclaims ownership.

In 2011, Terrace View, an apartment complex in Blacksburg, Virginia, was sold. (Complaint at ¶¶ 156–59). Trustee asserts that Debtor was entitled to receive proceeds from the sale by virtue of Debtor's interests in First Concord, L.P.[2] and New River Valley Associates, Ltd. ("New River Valley")[3] (the "Terrace View Proceeds"). Trustee asserts that the portion of the proceeds owed to JHH through First Concord (the "First Concord Funds"), and ultimately to Debtor as 100% owner of JHH, were instead directed to Mrs. Harman, pursuant to the allegedly invalid 1990 Assignment. (Complaint at ¶ 165). As noted above, Trustee asserts that this assignment is invalid because it has been honored only sporadically, and because it was backdated to 1990 when it was, in fact, executed well after that time. Convenient-

---

**2.** Specifically, Trustee states that Debtor owned 100% of JHH, which owned 100% of FEP II. FEP II owned 37% of First Equities Associates—BH, which, in turn, was a Class B Limited Partner of First Concord. Trustee asserts the net proceeds due Debtor through his interest in JHH is $1,695,362 (Complaint at ¶¶ 163–64).

**3.** Debtor was a limited partner of New River Valley, with a 3.56% ownership interest. Trustee alleges Debtor was entitled to $257,256 in proceeds by virtue of his interest in New River Valley. (Complaint at ¶¶ 171–73).

ly, the federal tax returns of JHH listed Mrs. Harman as 100% owner for the first time in 2011, though Debtor had been listed as sole owner in prior tax years.[4] (Complaint at ¶ 83).

Trustee asserts that the amount to which Debtor was entitled by virtue of his interest in New River Valley (the "NRV Funds"), was instead diverted to an account held by Shadrix in an effort to avoid garnishment. At the time, Debtor was subject to garnishment by Carolyn T. McAfee as executor of the estate of James T. McAfee ("McAfee"). (Complaint at ¶ 176). Smith Conerly, Debtor's long-time counsel, had been served with a summons of garnishment April 20, 2011, seeking to collect from Smith Conerly any of Debtor's property in Smith Conerly's possession. (Complaint at ¶ 178). Thus, Trustee alleges, Mr. Smith asked his friend, Gregory Shadrix, to hold the NRV Funds in Shadrix's trust account. (Complaint at ¶ 179). Funds of $257,256.05 were transferred to Shadrix May 25, 2011. (Complaint at ¶ 181). Also on May 25, 2011, Smith Conerly responded to the summons of garnishment in the negative: it was not then in possession of any property of Debtor. (Complaint at ¶ 187). Notably, the Facsimile Transaction Receipt received by Shadrix shows the "reference for beneficiary" of the transfer as "Joe Harmon"; Shadrix's trust account ledger indicates that the funds were received from Smith Conerly. (Complaint at ¶¶ 182–83). On May 26, 2011, Smith Conerly requested that Shadrix transfer $89,202.18 of the NRV Funds to Smith Conerly, and Shadrix complied.[5] (Complaint at ¶ 188). Trustee re-

ports that he has recovered $168,053.87, the funds held by Shadrix at the time of the petition; however, the $89,202.18 transferred to Smith Conerly has yet to be recovered. (Complaint at ¶¶ 193–94).

Trustee asserts that, even during the pendency of this bankruptcy case, Debtor has continued to attempt to divert assets beyond the reach of creditors. For example, in late 2011, after a contractual holdback period had expired for a portion of the Terrace View proceeds, FEP II was entitled to receive additional funds from the sale (the "Held–Back Concord Funds"). (Complaint at ¶ 197). Instead of being distributed to Debtor, as Trustee asserts it should have been, the Held–Back Concord Funds were diverted to Mrs. Harman under the 1990 Assignment. (Complaint at ¶ 199). Debtor also received additional disbursements by virtue of his interest in New River Valley (the "Held–Back NRV Funds"; together with the Held–Back Concord Funds, the "Held–Back Funds"). (Complaint at ¶ 200).

On December 31, 2012, Debtor and Mrs. Harman caused JHH to sell its 9.9% interest in First Concord, LP and its 6.65% interest in Mark Monro Associates, Ltd., and caused FEP II to sell its 9.9% interest in First Concord, LP and its 0.33% interest in Alpine Self Storage, Ltd. (Complaint at ¶ 90). At the same time, Mrs. Harman sold her 9.9% interest in First Concord, LP, her 0.432% interest in Alpine Self Storage, Ltd., and her 20% interest in Stonemark Management, LLC. *Id.* In December 2012, JHH, FEP, FEP II, and Mrs. Harman sold interests for a total of

---

4. Trustee notes that Debtor has produced documents purporting to transfer his interest in JHH to Mrs. Harman as of May 31, 2001. However, that transfer, if it occurred, would have taken place during Debtor's prior bankruptcy case, and, without court approval, would be void *ab initio.*

5. Moreover, Trustee notes that, after Shadrix requested to know the matter to which the transfer was being made, Smith Conerly replied in an email "Joseph H. Harman ... McAfee". (Complaint at ¶ 189).

$987,500 (the "December 2012 Sale Proceeds"), of which $236,205.88 was attributable to the sale of JHH's, FEP's, and FEP II's interests. (Complaint at ¶ 93). Trustee asserts the entire amount of the December 2012 Sale Proceeds are property of the estate.

### The Complaint

The Complaint asserts twenty four counts against the various Defendants; however, only Counts II, III, IV, VIII, XVII, XVIII, XIX, XX, **XXI,** and XIV appear to be asserted against Shadrix. Of these, the Motion addresses only Count XXI.[6] In Count XIX, Trustee asserts that the transfer of the NRV Funds to Shadrix was made with the actual intent to hinder, delay, or defraud Debtor's creditors, and that such transfer either was made when Debtor was insolvent or rendered Debtor insolvent. Specifically, Trustee asserts that the transfer was made "on the eve of this Bankruptcy Case," while Debtor and Smith Conerly were subject to garnishment. Trustee asserts that $168,053.87 of the NRV Funds have been turned over to Trustee, but $89,202.13 remain outstanding. Accordingly, Count XIX seeks to avoid the transfer pursuant to 11 U.S.C. § 548(a)(1)(A). Under § 548(a)(1)(A),

"[T]rustee may avoid any transfer ... of an interest of the debtor in property ... that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was ... indebted[.]"

■ In Count XX, Trustee asserts that the transfer of the NRV Funds to Shadrix was made at a time when Debtor was insolvent or that Debtor became insolvent as a result of the transfer, and that the transfer was for less than reasonably equivalent value. Thus, Trustee seeks to avoid the transfer of NRV funds to Shadrix under 11 U.S.C. § 548(a)(1)(B), which provides that

"[T]rustee may avoid any transfer ... of an interest of the debtor in property ... that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer or obligation[.]"

Having attempted to avoid the transfer of the NRV Funds to Shadrix in Counts XIX and XX, Trustee seeks, in Count XXI, to recover the NRV Funds under § 550, which provides

"[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

Once Trustee establishes that a transfer is avoidable under § 548, § 550 allows Trustee to recover the value of such transfer from an initial, immediate, or mediate transferee, or the entity for whose benefit

---

**6.** The Motion does not discuss Counts II, III, IV, VIII, XVII, XVIII, XIX, XX, or XXIV, but does seek dismissal of "each of Trustee's claims against Shadrix". The Court will not address the Motion to the extent it prays for

relief which is not properly briefed. *See* Fed. R.Civ.P. 7(b) ("A request for a court order must be made by motion. The motion must ... state with particularity the grounds for seeking the order[.]")

the transfer was made. Thus, Count XXI seeks to recover the value of the transfer from Shadrix as initial transferee, or from Smith Conerly as immediate or mediate transferee of the initial transferee.

## Discussion

 Bankruptcy Rule 7008 applies Rule 8 of the Federal Rules of Civil Procedure to adversary proceedings.

A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief.

Fed.R.Civ.P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of liability. *Id.* at 556, 129 S.Ct. 1955. "The pleadings are construed broadly, and ... allegations in the complaint are viewed in the light most favorable to the plaintiff." *Watts v. Florida Int'l University*, 495 F.3d 1289, 1295 (11th Cir.2007) (internal citations omitted).

 A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556

U.S. at 678, 129 S.Ct. 1937 *quoting Twombly*. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

 In Counts XIX, XX, and XXI, Trustee seeks to avoid the transfer of NRV Funds away from the estate, and recover the value of that transfer. In Count XIX, Trustee seeks avoidance under § 548(a)(1)(A), for which Trustee must allege that Debtor had an interest in the property transferred, that the transfer occurred within two years prior to the date of the petition, and that Debtor made such transfer with the actual intent to hinder, delay, or defraud creditors. In Count XX, Trustee seeks avoidance under § 548(a)(1)(B), for which Trustee must allege that Debtor had an interest in the property transferred, that the transfer occurred within two years prior to the date of the petition, that Debtor did not receive reasonably equivalent value for the transfer, and that Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. In Count XXI, Trustee seeks to recover the value of the transfer from Shadrix under § 550, for which Trustee must allege that the transfer may be avoided under, *inter alia*, § 548, and that Shadrix is the initial, immediate, or mediate transferee of the transfer, or the entity for whose benefit the transfer was made.

As a threshold matter, Trustee has plausibly alleged that Debtor had an interest in the NRV Funds. According to Trustee, Debtor was a limited partner of New River Valley, with a 3.56% ownership interest. In turn, New River Valley was one of five entities that owned various parts of the Terrace View real estate sold. Thus, Trustee alleges, Debtor was entitled to the NRV Funds by virtue of his interest in New River Valley.

Trustee has properly alleged that the transfer of NRV Funds occurred within two years of the Petition Date. Trustee alleges the transfer of NRV Funds to Shadrix occurred May 25, 2011. The petition initiating the underlying case was filed June 14, 2011 (the "Petition Date"), so the transfer occurred less than a month before Petition Date; therefore, the transfer occurred within the two years prior to the Petition Date.

In support of avoidance under § 548(a)(1)(A), Trustee alleges that the funds were transferred to Shadrix to avoid garnishment by McAfee. An attempt to avoid a garnishment action shows a clear intent to hinder the efforts of a creditor. Thus, Trustee's allegations, taken as true, properly state a claim for relief under § 548(a)(1)(A).

In support of avoidance under § 548(a)(1)(B), Trustee alleges that Debtor was insolvent at the time of the transfer or as a result of the transfer. Trustee points to the fact that Debtor made the transfer "merely weeks prior to the filing of this Bankruptcy Case." Taking the allegations as true, the Complaint raises a reasonable expectation that discovery might uncover evidence of Debtor's insolvency at the time the transfer was made. Trustee also alleges that the transfer was made for no consideration. Zero consideration is, of course, "less than reasonably equivalent value" for the transfer of hundreds of thousands of dollars. Accordingly, it appears that Trustee has sufficiently pleaded the elements of avoidance under § 548(a)(1)(B).

To recover the transfer of NRV Funds under § 550, having properly pleaded avoidance of the transfer under § 548, Trustee need only allege that Shadrix was the initial, immediate, or mediate transferee of the NRV Funds, or that Shadrix was the entity for whose benefit the transfer was made. As Trustee has alleged that the funds were transferred to Shadrix, Trustee has stated a plausible case for recovery of the value of the transfer pursuant to § 550.

It should be noted that Shadrix does not appear to dispute that Trustee has properly alleged the elements of avoidance and recovery under §§ 548 and 550. Instead, the Motion argues that Shadrix is exempted from the recovery powers of § 550 as a "mere conduit" of the transfer. Shadrix argues that entities that do not exercise "dominion and control" over property transferred are merely "financial conduits" which, equitably, should be excepted from Trustee's recovery powers under § 550.

The 11th Circuit has held that, in certain circumstances, recipients of fraudulently-transferred funds are not "initial recipients" as contemplated in § 550 where those recipients are innocent conduits who are not involved in the scheme. *See, e.g., Martinez v. Hutton,* 628 F.3d 1312, 1321 (11th Cir.2010); *In re International Administrative Services, Inc.,* 408 F.3d 689, 705–06 (11th Cir.2005). However, Shadrix's good faith or innocence in the transaction is a disputed matter of fact, not appropriate for disposition at the Motion to Dismiss stage. Shadrix argues, "Trustee does not allege that Shadrix was part of the alleged conspiracy regarding the Missing NRV Funds, that it possesses the Missing NRV Funds or that it has any idea what happened to the funds[.]" However, Trustee is not charged, at this stage, to allege facts controverting possible affirmative defenses. *La Grasta v. First Union Securities, Inc.,* 358 F.3d 840, 845 (11th Cir.2004) ("plaintiff is not required to negate an affirmative defense in [the] complaint") (quoting *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993)). Generally, "the existence of an affirmative de-

fense will not support a Rule 12(b)(6) motion to dismiss for failure to state a claim" unless "the defense clearly appears on the face of the complaint." *Starship Enterprises of Atlanta, Inc.,* 708 F.3d 1243, 1252–53 (11th Cir.2013). Trustee's failure to allege Shadrix's bad faith does not show Shadrix's good faith. Accordingly, it is hereby

**ORDERED** that the Motion is *denied.*

IT IS SO ORDERED.